UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

J MACK LLC, *et al.*,

      **Plaintiffs,**

            Case No. 2:13-cv-808
            JUDGE SMITH
    v.          Magistrate Judge Kemp

DANIEL LEONARD, *et al.*,

      **Defendants.**

**OPINION AND ORDER**

    This case deals with the seizure of synthetic marijuana by law enforcement officers at a time when it was uncertain whether the synthetic marijuana was illegal in Ohio.  The Plaintiffs bring this case pursuant to 42 U.S.C. § 1983 alleging that the seizure violated their Fourth Amendment rights.  Presently pending before the Court are the parties' cross-motions for summary judgment (Docs. 18, 19, & 24).  For the reasons set forth herein, the Court **GRANTS** the Defendants' motions and **DENIES** the Plaintiffs' motion.

    I.    BACKGROUND

    On August 18, 2011, Plaintiff J MACK LLC was selling products it and co-Plaintiff Jerry McCommack, Jr., its principal, refer to as "potpourri" (hereinafter "pot") from a roadside stand in Meigs County, Ohio.  After consulting with the local prosecutor, Defendants Sergeant R.J. Jacks and Trooper Adam Williams, accompanied by Defendant Meigs County Deputy Sheriff Daniel Leonard, confronted the Plaintiffs at the roadside stand and seized their pot inventory.  The Plaintiffs initiated this lawsuit pursuant to 42 U.S.C. § 1983 claiming that the Defendants, acting under color of state law, confiscated the pot in violation of their Fourth Amendment right

to be free of unreasonable seizures of their property.  Specifically, the Plaintiffs contend that because an Ohio statute criminalizing the possession and/or sale of synthetic marijuana had not gone into effect at the time of the seizure and no other statute rendered the pot contraband, the Defendants lacked probable cause to effectuate the seizure.  They further contend that the Defendants are not otherwise protected by the doctrine of qualified immunity.  The Parties have filed cross-motions for summary judgment and the Court will now summarize the factual record submitted by the parties.

The Plaintiffs own and operate a gas station in Ravenswood, West Virginia.  (*See* McCommack Dep. 12, Doc. 18-1).  In April 2011, they obtained an Ohio transient vendor's sales license for the purpose of selling the pot in Ohio from a roadside stand.  (*Id.* at 43–44).  The Plaintiffs had previously sold the pot at the gas station, and, in April or May of 2011, began selling it in Ohio.  (*Id.* at 38).  In the summer of 2011 it became illegal to sell the pot in West Virginia.  (*Id.* at 39).

The pot sold by the Plaintiffs had brand names such as "Funky Green Stuff", "Purple Haze," and "Cannabus."  (*Id.* at 35, 75).  It was purchased by the Plaintiffs from a company called "Bold Scents" and from other suppliers.  (*Id.* at 47).  The Plaintiffs purchased the pot in bulk and then repackaged it into smaller packages of various sizes.  (*Id.* at 99–100).  The packaging contained labels stating that the pot was not to be used for human consumption and was not intended for use by minors.[1]  (*Id.* at 111–12).  According to McCommack, they would sell an ounce of certain varieties of the pot for $200 and up.  (*Id.* at 100).  The Plaintiffs sold lighters and cigarette and cigar rolling papers from the roadside stand along with the pot and other products.  (*Id.* at 84–86).  They did not, however, sell tobacco products at the stand.  (*Id.* at

---

[1] The admonition against use by minors seems unnecessary if the pot was indeed not intended for human consumption in the first place.

89). The Plaintiffs kept lab reports at the stand that stated what chemical compounds were purportedly not present in certain varieties of pot that they sold. (*See id.* at 144–146, Ex. N, Doc. 18-2 at 45–50). They did not have a report for every type of pot and McCommack is not sure of the validity of the reports as he had received them directly from Bold Scents. (*See* McCommack Dep. 145–48, Doc. 18-1).

The Plaintiffs initially located their roadside stand on Meigs County property, first at, and later near, a park and ride along Route 33. However, the Highway Patrol informed them that they could not conduct sales from the park and ride, and, after moving, the Meigs County Sheriff told them to relocate the operation to private property. (*Id.* at 120–25). That order followed an incident involving a mother who allegedly brandished a firearm at the Plaintiffs' employee, claiming that they had sold the pot to her underage son. (*Id.*). On August 18, 2011, the day when the Defendants seized the pot, the Plaintiffs were operating the roadside stand on private property along State Route 124 with permission from the owner. (*Id.* at 127). According to Defendant Jacks, there had been numerous citizen complaints about "sons and daughters" buying and smoking the pot prior to August 18th. (Jacks Dep. 29, Doc. 18-3).

The events leading to the seizure of the pot began with a traffic stop initiated by Trooper Shawn Cunningham. At about 4 p.m. on August 18th, Cunningham observed a driver speeding along Route 124. (Cunningham Aff. ¶ 5, Doc. 18-9 at 1). The driver of the vehicle initially did not stop at Cunningham's signal, but he was eventually apprehended with the help of Defendants Jacks and Williams. (*Id.* ¶¶ 6–11). As the driver had a suspended license, Cunningham arranged to have his vehicle towed. (*Id.* ¶ 13). While inventorying the contents of the vehicle, he discovered what he believed to be synthetic marijuana in a "small, sealed package" in the glove compartment. (*Id.* ¶¶ 15–16). The driver admitted that the package belonged to him and that he

had recently purchased it from an individual selling it along Route 124. (*Id.* ¶¶ 17–18). Cunningham informed Jacks that he had discovered synthetic marijuana and that the driver had recently purchased it along Route 124. (*Id.* ¶ 20).

At some point after the driver of the vehicle had been arrested and the synthetic marijuana discovered, Jacks called Meigs County Prosecutor Colleen Williams to discuss the situation:

> Q. Okay. And what was the nature of that phone call? What do you recall being said during that phone call?
>
> A. I explained the situation to her, that we had a suspect that was, you know, running from us. To me -- it seemed like to me he was under the influence of something. We found this synthetic marijuana, explained the situation, how we had numerous complaints about the individuals, how troopers have been in contact with with them, law enforcement been in contact with them, having a lot of issues because of the -- whoever was selling this synthetic marijuana in the area, and asked her what our authority was at that time.
>
> Q. Okay. And what did she say to you?
>
> A. You know, we talked about it back and forth. There had been a law passed at the time that said that, you know, you couldn't sell or possess this mind-altering substance, but it had not -- the effective date had not arrived yesterday, so what we discussed and what she thought is that we could proceed with charging the suspects with selling -- I have a hard time pronouncing this word.
>
> MS. LINN: Hallucinogenic.
>
> THE WITNESS: Yeah. I have a hard time, so you'll hear me stutter over that a couple of times. But selling hallucinogenic substances, and that's the direction she wanted to go.
>
> BY MR. PETTEY:
>
> Q. And was what she told you consistent with your understanding of the law at that time?
>
> A. Yes.
>
> Q. And do you recall what -- whether the statute that you discussed with Colleen Williams was the selling harmful intoxicants statute?

4

>A. You know what? I don't recall that. I saw, I think in this report or somewhere, somebody listed that, but I'm pretty certain we talked about hallucinogenics at the time.
>
>Q. Again, I believe that report references the statute that certainly ultimately -- well, there's -- if you would review the report and let me know, is there a statute that's referenced in the report?
>
>A. There is. And I said that, but that's not what we discussed.
>
>Q. Okay.
>
>A. What was in the report and what we discussed is two different things.
>
>Q. Okay. What's in the report?
>
>A. Trafficking in harmful intoxicants.
>
>Q. And so is it your understanding that there was some other statute relating to hallucinogens –
>
>A. Yes.
>
>Q. -- That you discussed with Ms. Williams?
>
>A. From the conversation that I had with Ms. Williams, yes.

(Jacks Dep. 38–40, Doc. 18-3).  According to Jacks, Williams then instructed him to seize the pot after confirmation that it was being sold from the roadside stand.  (*Id.* at 42–43).  Defendant Williams did not overhear the conversation between Jacks and Prosecutor Williams, but understood that they were to investigate the roadside stand.  (*See* Williams Dep. 17–18, Doc. 18-7).  Defendant Williams considered Jacks to be his superior officer and followed his instructions during the investigation.  (*See id.* at 18–19).  At the time the pot was seized, he had not formed an opinion as to whether it was actually illegal under Ohio law.  (*See id.* at 30 ("Q. And so at the time they were seized, you didn't have an opinion as to whether they were contraband or not; would that be fair to say?  A. Correct.")).

5

When Jacks and Williams arrived at the location where the Plaintiffs were operating, Jacks observed the pot stored in "plastic bins." (Jacks Dep. 43, Doc. 18-3). He was concerned that he might lack jurisdiction ("there was some question in my mind whether or not it was on the State right of way or if it was not"), so he called the Meigs County Sheriff's Department for assistance "to make sure the proper agency who had jurisdiction was proceeding with the investigation." (*Id.* at 42–43). Defendant Deputy Leonard was then dispatched to the scene to assist in the investigation. (Leonard Dep. 9, Doc. 18-5). According to Leonard, it was his understanding after speaking with Jacks that they were to seize the pot:

> Sergeant Jacks said that they had a complaint on it, that it was on private property, contacted our prosecutor, which was Colleen Williams, and she said since the law came into effect where it was illegal, to go ahead and seize the property.

(*Id.* at 18–19).

After the Defendants arrived at the location, McCommack received a telephone call from his employee who informed him that law enforcement personnel were seizing the Plaintiffs' pot inventory. (McCommack Dep. 133–34, Doc. 18-1). McCommack then traveled from the gas station where he was working to the location. (*See id.* at 136–37). According to McCommack, the Defendants informed him that he was being cited for the sale of harmful intoxicants and that his pot was being confiscated. (*Id.* at 141). He also testified that he was told that he would not be charged with a felony if he stopped selling the pot in Meigs County. (*Id.* at 141).

The Defendants inventoried the pot and loaded it into Leonard's patrol car. (Jacks Dep. 49, Doc. 18-3; Williams Dep. 27, Doc. 18-7). In total, the Defendants seized 355 bags and 55 bottles of pot. (Leonard Dep. 45, Ex. 4, Docs. 18-5, 18-6 at 24). The Defendants also seized $188 in cash. (Leonard Dep. 36, Ex. 4, Docs. 18-5, 18-6 at 7).

According to Jacks, the pot would have been seized regardless of how it was packaged or how it was priced. (Jacks Dep. 51, Doc. 18-3). The Defendants did not open any of the packages to verify their contents. (Jacks Dep. 73, Doc. 18-3; Williams Dep. 26–27, Doc. 18-7; Leonard Dep. 30, Doc. 18-5). However, Leonard testified that the packaging was labeled with the names of the different pot varieties. (Leonard Dep. 29, 18-5 ("little silver packages with the names of the potpourris on them")). McCommack himself helped the Defendants inventory the seized packages. (McCommack Dep. 165, Doc. 18-1).

Both Williams' and Leonard's reports concerning the seizure of the pot identify the applicable offense involved as trafficking in harmful intoxicants in violation of § 2925.32 of the Ohio Revised Code. (Leonard Dep. Ex. 5 at 1, Doc. 18-6 at 25; Williams Dep. Ex. C at 1, Doc. 18-8 at 5). However, Jacks testified that he did not believe that statute was applicable:

> Q. Was it your understanding at the time that the selling harmful intoxicants statute would apply to the items that are at issue in this case?
>
> A. No.
>
> Q. And why is that?
>
> A. You know, I don't even know how it's worded. The reason why I said what I said or what we talked about is because [Prosecutor Williams] said hallucinogens.

(Jacks Dep. 41, Doc. 18-3). The Plaintiffs were never charged with any crime related to the seizure of the pot. (*See* McCommack Dep. 141, Doc. 18-1).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to

support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the Parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he or it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment

8

on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.*), 757 F.2d 698, 705 (5th Cir.1985)). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

### III. DISCUSSION

#### A. The Plaintiffs' First Claim

The Plaintiffs' first claim is brought pursuant to 42 U.S.C. § 1983, which establishes a cause of action against state officials who violate constitutional rights while acting under color of state law. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). They contend that the pot was seized by the Defendants without a warrant and without probable cause in violation of the Fourth Amendment. The Defendants assert that probable cause existed and/or that they are otherwise protected from liability by the doctrine of qualified immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If qualified immunity is applicable, the official is not only immune from damages, but is immune from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

9

"Qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (internal quotations omitted). The plaintiff in a civil action bears the burden of establishing that defendants are not entitled to qualified immunity, and must demonstrate that a constitutional right was violated and that the right was clearly established. *Id.* Deciding whether qualified immunity exists involves three steps—the Court must determine (1) "whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;" (2) "whether the violation involved a clearly established constitutional right of which a reasonable person would have known;" and (3) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quotations and citations omitted).

The Court will now proceed through the qualified immunity analysis, noting that the first step of the inquiry overlaps with the merits of the Plaintiffs' claim. As such, resolution of the claim at this stage is appropriate if the Court determines that undisputed facts establish that the Defendants' either did or did not have probable cause to seize the pot in conformance with the Fourth Amendment. If the Court determines that no probable cause existed, it must proceed through the second and third stages of the qualified immunity analysis. If a disputed issue of fact is present that would allow a reasonable jury to decide the case for either party based on resolution of the factual dispute, the Court must deny the parties' motions and the case must proceed to trial on the issue of liability. *See Hale v. Kart*, 396 F.3d 721, 729 (6th Cir. 2005).

**1. Did a Constitutional Violation Occur?**

The Plaintiffs allege that, in seizing the pot, the Defendants violated their rights under the Fourth Amendment, which provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Courts have deemed the Fourth Amendment's protections to be incorporated against the states via the Fourteenth Amendment.  *See Stricker v. Township of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013).  Pursuant to the Fourth Amendment, a warrant based on probable cause is usually required to search a place and seize evidence of crime found there.  *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002).  One exception to the warrant requirement is the so-called "plain-view" doctrine:

> it is [ ] well settled that objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.

*Payton v. New York*, 445 U.S. 573, 586–87 (1980).  Stated differently, pursuant to the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  *See also United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1998) ("contraband in plain view may be seized if legally accessed").

Accordingly, police may seize objects without a warrant in public places or in plain-view if they have probable cause to believe that the objects are contraband.  "[P]robable cause means a

reasonable ground for belief that the item seized is contraband or evidence of a crime….” *United States v. Baro*, 15 F.3d 563, 567 (6th Cir. 1994). Probable cause does not equate to absolute certainty:

> the Supreme Court does not require that officers *know* that evidence is contraband. Instead, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime."

*McLevain*, 310 F.3d at 441 (emphasis in original) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). Probable cause has also been described as a "fair probability" in light of the totality of the circumstances. *See United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013). "The [probable cause] inquiry is an objective one" and "depends upon the reasonable conclusion to be drawn from the facts known" to the police officer at the time of seizure of contraband "regardless of the [ ] officer's subjective state of mind." *Hoover v. Walsh*, 682 F.3d 481, 500 n.52 (6th Cir. 2012) (internal quotations omitted). A determination of probable cause must be "supported by less than prima facie proof but more than mere suspicion." *United States v. Howard*, 621 F.3d 433, 453 (6th Cir. 2010) (quotation omitted).

The following basic facts are not in dispute: 1) Law enforcement had received complaints about the Plaintiffs' sales of the pot; 2) on August 18, 2011, Defendants Jacks and Williams helped apprehend a driver who may have been intoxicated and who admitted to possessing synthetic marijuana that he had recently purchased from the roadside stand operated by the Plaintiffs; 3) after the driver was apprehended, Jacks consulted with Prosecutor Colleen Williams and together they formed the belief that the pot was illegal by virtue of an Ohio statute prohibiting hallucinogenic substances; and 4) the Defendants arrived at the roadside stand and seized the Plaintiffs' pot inventory and cash.

The Court will now apply these basic facts to the Fourth Amendment standards articulated above. The Plaintiffs focus on the fact that the Defendants never obtained a search warrant, however, this case falls squarely within the plain-view exception to the warrant requirement. In this regard, the Plaintiffs were operating a business selling the pot in a location accessible to the public and there is no suggestion that the pot was somehow hidden or concealed in an area that only the Plaintiffs' employees could access. That the Plaintiffs' operation may have been on private property is of no consequence to the Court's conclusion that no warrant was required. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment Protection."); *United States v. Various Gambling Devices*, 478 F.2d 1194, 1200 (5th Cir. 1973) ("a law enforcement officer may enter commercial premises open to the public and observe what is in plain view").

It is likewise of no consequence that the Defendants never actually opened any of the packages given Leonard's testimony that the packaging contained the name of the pot variety to be found within. That fact, coupled with the information ascertained from the apprehended driver and the suggestive names (e.g., "Cannabus") used for the pot, are more than enough to have established probable cause that the packages contained the same type of substance the driver admitted having purchased from the roadside stand.

These conclusions, however, do not end the inquiry. In order to seize the pot, even if it were in plain-view, the Defendants still must have had probable cause to believe that it was contraband. Construing all the facts in the Plaintiffs' favor, the Court concludes that the Defendants did have probable cause to seize the pot.

The Defendants do not convincingly assert that the pot actually was illegal in Ohio under any laws in effect at the time the seizure occurred.[2] As such, the Plaintiffs' First Claim turns on whether probable cause can be established via a law enforcement officer's mistake concerning whether a substance actually is contraband. In other words, this case does not involve a mistake of fact in that the Defendants did not believe that the substance seized was, for instance, real marijuana. Rather, they were aware of the nature of the substance, but simply mistaken as to whether that substance was actually illegal at the time it was seized.

In *Heien v. North Carolina*, 135 S. Ct. 530 (2014), the Supreme Court very recently held that an officer's *reasonable* mistake of law can give rise to reasonable suspicion necessary to temporarily detain an individual. *See id.* at 539. Emphasizing that the mistake must be reasonable, the Court stated:

> Contrary to the suggestion of Heien and *amici,* our decision does not discourage officers from learning the law. The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved. And the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation. Thus, an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce.

*Id.* at 539–40 (citation omitted) (emphasis in original).

*Heien* involved a traffic stop initiated in part because one of the car's brake lights was not working, which the officer in question believed to be in violation of North Carolina law. *Id.* at 534–35. Cocaine was found in the car following the stop. *Id.* However, on appeal of Heien's conviction for attempted trafficking in cocaine, the North Carolina Court of Appeals held that the

---

[2] The Trooper Defendants' briefing mentions in passing a United States Drug Enforcement Agency regulation in effect in 2011 purportedly listing five types of synthetic cannabinoid compounds as Schedule I controlled substances. (*See* Doc. 25 at 10). However, as they made no detailed attempt to argue that the pot could have been considered contraband pursuant to that regulation, the Court will not consider the regulation as a possible basis for a reasonable mistake of law by the Defendants.

North Carolina statute governing brake lights only required a car to have one such light and that the traffic stop, therefore, was not supported by reasonable suspicion. *Id.* at 535. The North Carolina Supreme Court reversed the Court of Appeals on the issue of reasonable suspicion. *Id.* Upon holding that reasonable suspicion could be supported by a reasonable mistake of law, the Supreme Court ultimately found that the officer's mistaken understanding of the statute governing brake lights was reasonable. *Id.* at 540. In doing so, the Court noted that the language of the statute in question could be reasonably construed to mean that if a car had more than one brake light, all of the lights must be in working order. *Id.* The Court further noted that the statute in question had never previously been construed by North Carolina's appellate courts. *Id.*

While *Heien* was decided in the context of a stop based on reasonable suspicion, this Court has no reservation in extending *Heien's* rational to the probable cause analysis, especially given that the Supreme Court's decision is based in part on nineteenth century precedent that it characterized as establishing the proposition that a mistake of law can support a finding of probable cause.[3] *Id.* at 537 ("This holding—that reasonable mistakes of law, like those of fact, would justify certificates of probable cause—was reiterated in a number of 19th-century decisions."). Accordingly, this Court must now determine whether the Defendants' mistake as to the illegality of the pot was reasonable.

The record before the Court indicates three separate potential grounds for mistakenly believing that the pot was illegal: 1) a statute criminalizing "hallucinogenic substances"; 2) the Ohio controlled substances analog statute; 3) and the Ohio statute criminalizing the trafficking of "harmful intoxicants."

---

[3] As noted by the Sixth Circuit, prior to *Heien*, the "vast majority" of circuit courts to have considered the issue had decided that a mistake a law could never serve as a basis for establishing probable cause or reasonable suspicion. *United States v. Gross*, 550 F.3d 578, 584 n.2 (6th Cir. 2008).

15

Turning first to the purported statute banning hallucinogenic substances, Jacks was adamant that such a statute was the basis agreed upon by he and Prosecutor Williams as grounds for the seizure of the pot.  However, as the Defendants have not pointed the Court to any Ohio statute dealing with hallucinogenic substances, the Court concludes that no such statute exists, and further determines that it was objectively unreasonable for the Defendants to rely on a non-existent statute as the basis for the seizure.  It is true that Jacks, to a certain extent, relied upon the legal advice of the prosecutor, but this situation is far different than that examined by the Supreme Court in *Heien*, where reasonable minds could differ as to the meaning of an existing statute.  Allowing police to rely on non-existent statutes even on the advice of counsel would encourage ignorance of the laws police are sworn to uphold.  Stated differently, it is not unreasonable to expect police to have enough knowledge of the criminal laws they enforce to be aware of whether a specific criminal statute actually exists.  *See United States v. Washington*, 455 F.3d 824, 828 (8th Cir. 2006) ("The concept of an objectively reasonable mistake of law cannot be [ ] unmoored from actual legal authority.").

The Court similarly finds that it was objectively unreasonable for the Defendants to rely upon the statute criminalizing controlled substance analogs, as that statute had not gone into effect at the time of the seizure.  *See* OHIO REV. CODE § 3719.013 (effective date October 17, 2011).  Jacks testified that he knew that the statute had yet to come into effect on August 18, 2011, but, according to Leonard, his conversation with Jacks led him to the understanding that the statute was effective at the time of the seizure and formed the basis for the seizure.  However, the question of whether that statute actually was in force on August 18, 2011 is not one upon which reasonable minds could disagree.  Thus a mistaken belief in the statute's applicability was unreasonable.

The Court now turns to the Ohio statute banning the trafficking of "harmful intoxicants,"—Ohio Revised Code § 2925.32. The Plaintiffs argue that it is impermissible for the Court to consider that statute as a possible basis of a reasonable mistake of law by the Defendants as none of them testified that it was their perceived grounds for seizing the pot at the time the seizure was made.[4] However, the Supreme Court has held that "[an officer's] subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). The Court will therefore consider the harmful intoxicants statute as a possible justification for the seizure.

Section 2925.32 provides in part that, "[n]o person shall knowingly dispense or distribute a harmful intoxicant to a person age eighteen or older if the person who dispenses or distributes it knows or has reason to believe that the harmful intoxicant will be used in violation of section 2925.31 of the Revised Code [(pertaining to the abuse of harmful intoxicants)]." OHIO REV. CODE § 2925.32(A)(2). The Ohio Revised Code defines "harmful intoxicant" as follows:

"Harmful intoxicant" does not include beer or intoxicating liquor but means any of the following:

> (1) Any compound, mixture, preparation, or substance the *gas*, *fumes*, *or vapor* of which when inhaled can induce intoxication, excitement, giddiness, irrational behavior, depression, stupefaction, paralysis, unconsciousness, asphyxiation, or other harmful physiological effects, and includes, but is not limited to, any of the following:
>
>> (a) Any volatile organic solvent, plastic cement, model cement, fingernail polish remover, lacquer thinner, cleaning fluid, gasoline, or other preparation containing a volatile organic solvent;
>>
>> (b) Any aerosol propellant;
>>
>> (c) Any fluorocarbon refrigerant;

---

[4] The reports of both Williams and Leonard did cite § 2925.32 as the basis for the seizure.

17

>> (d) Any anesthetic gas.
>
> (2) Gamma Butyrolactone;
>
> (3) 1,4 Butanediol.

*Id.* § 2925.01(I) (emphasis supplied).

The Defendants argue that it would have been objectively reasonable to believe that synthetic marijuana could be deemed a substance the inhalation of the "gas", "fumes," or "vapor" of which can induce intoxication. The Court agrees. In this regard, the terms "gas," "fumes," and "vapor" are not defined by the Ohio Revised Code. It is commonly understood that one way in which marijuana or synthetic marijuana can be used to get high is through burning and inhalation of the resulting smoke. While the term "smoke" is absent from the statute, it is perfectly reasonable to conclude that the terms gas or vapor could encompass smoke emitted from burning.

Both sides note that the question of whether § 2925.32 is applicable to real or synthetic marijuana has apparently never been addressed by an Ohio court. According to the Defendants, that fact renders the instant case similar to *Heien*, as reasonable minds could differ as to whether the terms "gas," "fumes," or "vapor", which are undefined, could include smoke from synthetic marijuana. The Plaintiff, on the other hand, notes that the absence of precedent concerning the statute could indicate that the common understanding is that the statute was not intended to apply to substances such as marijuana that are burned. However, absence of any prosecutions for synthetic marijuana could just as easily reflect the fact that synthetic marijuana has only relatively recently been introduced to the United States. (*See* Doc. 25 at 13).

Accordingly, the Court concludes that probable cause to seize the pot existed based on an objectively reasonable mistake of law concerning § 2925.32. Therefore, the Defendants are

entitled to summary judgment as to the underlying merits of the Plaintiffs' First Claim. The Court will nonetheless proceed through the remaining steps of the qualified immunity analysis.

### 2. Was the Constitutional Right at Issue Clearly Established?

"For a right to be clearly established, [the] contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers*, 319 F.3d at 848 (internal quotation omitted). Here, the Court assumes without deciding that the right at issue is clearly established. In other words, a reasonable police officer should know that it is illegal under the Fourth Amendment to seize property that is not contraband.

### 3. Did the Defendants Act in an Objectively Unreasonable Manner in Light of the Clearly Established Constitutional Right?

The Court finishes the qualified immunity analysis by considering whether the Defendants acted in an objectively unreasonable manner by seizing the pot. "Qualified immunity shields an officer from suit when he or she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances that the officer confronted." *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Largely for the reasons stated in Part III.A.1 *supra*, the Court concludes that the Defendants acted reasonably. As noted there, reasonable minds could disagree as to the interpretation § 2925.32. Specifically, it would be perfectly reasonable for a hypothetical police officer to believe that synthetic marijuana could be illegal as a substance the gas or vapors of which causes intoxication.

Accordingly, the Court determines that the Defendants are entitled to qualified immunity as to the Plaintiffs' First Claim.

### B. The Plaintiffs' Second Claim

In addition to their § 1983 claim for the wrongful seizure of the pot, the Plaintiffs' Complaint also asserts a claim for conspiracy. (*See* Compl. ¶ 44). However, as the Court has determined that probable cause existed to seize the pot, that claim also must fail. The Plaintiffs cannot succeed on a theory that the Defendants conspired to violate their constitutional rights when no constitutional rights were actually violated.

### IV. CONCLUSION

For the above-stated reasons, the Plaintiffs' motion for summary judgment (Doc. 24) is **DENIED** and the Defendants' motions for summary judgment (Docs. 18 & 19) are **GRANTED**. The Clerk is directed to remove Documents 18, 19, and 24 from the Court's pending motions list and enter judgment in favor of the Defendants.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**